Honourable Judges, The Petitioner in this case seeks this Court's review of the BIA decision to adopt and affirm the Immigration Judge's decision to deny the Petitioner's applications for asylum, withholding of removal and protection under Convention Against Torture. In the Petitioner's case, the Immigration Judge found the Petitioner to be credible and there was no dispute that the Petitioner and his wife were ethnic Chinese and Christian Catholic. The issues were whether the Petitioner's experiences were sufficient to arise to the level of persecution and whether there was a pattern and practice of such groups similarly situated to the Petitioner. Since the Petitioner's opening brief was filed in April of 2004, there had been two major Ninth Circuit cases dealing with Indonesians of Chinese ethnicity and the ways in which a well-founded fear can be established. The first of this case would be the case of Sa'el v. Ashcroft. In Sa'el v. Ashcroft, the Ninth Circuit held that an asylum applicant can demonstrate a well-founded fear in either of two ways. The first would be relying on the pattern and practice of persecution of people similarly situated. But what is more interesting is that now an alternate approach is that the applicant can prove that she is a member of a disfavoured group coupled with the showing that she in particular is likely to be targeted as a member of that group. With that analysis, with the disfavoured group analysis, it consists of two elements. Even if she is a member of a disfavoured group, doesn't she have to prove either past persecution to show a presumption of future persecution or a well-founded fear of future persecution that is more likely than not to occur because this is a withholding of removal claim? Right? Didn't the I.J. find that she had not, that she had failed to establish past persecution? Your Honor, we are also seeking review of the facts of the case that whether there was past persecution. And do you point to that, under our rule, compels us to reach a contrary conclusion? With regards to past persecution, Your Honor? Yes. And in doing so, would you compare your case with the case, the Sahil v. Ashcroft case? Yes. Your Honor, if you would look at the fact pattern of, let's start with the fact pattern of Sahil. In the Sahil case, Sahil herself also related incidents of discrimination. She used the word discrimination throughout, you know, since she was little. And as a young student, she had already problems on account of her ethnicity. And she was threatened by an anti-Chinese mob that attacked a boarding school where she lived. And during the 1998 riots, she was again attacked by an anti-Chinese mob in Jakarta and by a group of anti-Chinese men in her own Bandung neighborhood. And her car was vandalized, and she was told that she better be careful. Now, in that case, she was present during the riots. The respondent, the facts of the respondent were, if I go first to, I'm sorry, to the petitioner. The ---- Isn't the Sahil case a much more severe case than this case? Your Honor, I would say not, because the petitioner had problems that occurred to his family, like his brother actually was involved in a car incident, and the brother actually died. Is the fact that the petitioner's family is still in Indonesia, weak in your case, they are still living there? Your Honor, I would say that that is not the sole determining factor. Not the sole determining factor, but aside from having their house marked once, is there any indication that the family has been in trouble? You mean based on right now? Yes. The family has continued to have problems, and the problems have shifted to them being Christian, because there are now news articles about church closures and problems on account of being Christian in Indonesia. But literally every Christian undergoes that, and some choose to leave and some choose to stay, and his family stays. Well, actually the petitioner's wife, the sister, is now in the United States and has been granted asylum, so there's movement from the family there with attempts to come here, and I have proof that the sister was granted asylum, the petitioner's wife, sister. Let's take a look at the facts in this case. Yes. She had the extortion at the supermarket situation, and she had a damaged car in the parking lot and inappropriate touching in the bus. Yes. Is that the basis of the persecution? Is there anything besides that? Your Honor, the ---- I mean, you have a problem there in that there's no indication that this was all done by the police or any group allied with the government, nor is there any evidence that she complained to the police and they did nothing. So how do we fulfill a requirement of persecution on account of state-sponsored or state-allowed action? Your Honor, if I could point the court to the administrative record 95 to 97. Say again? Administrative record 95 to 97. The petitioner's younger brother was actually killed by a native military officer's son. I'm having trouble understanding it. The petitioner's younger brother was actually killed at 11, when he was 11, by a native military officer's son who fled the crime scene after a hit-and-run accident. After the investigation by Indonesian police indicating who the perpetrator was, the police did not want to do anything about it, about the death, because they said that that was the destiny of the Chinese. So, Your Honor, the petitioner and his family had had encounters with the Indonesian authorities where they were not assisted. At a very young age, I believe the petitioner would have been very young at the time that his brother was killed at the age of 11, and that would have caused the family to believe that the Indonesian authorities were not willing or able to assist them with their problems. So, thereafter, I understand that there were incidents that occurred that did not seem to indicate that there was any request for police assistance, but I would argue that the incident involving the death of his brother, where they were not assisted by the police, would have already given them the impression that the police cannot be relied upon for assistance. All right. Counsel, you are not arguing the asylum application denial, are you? Your Honor, I had argued in my brief that the petitioner applied within a reasonable period of time of changed circumstances in Indonesia. The riots occurred in May of 1998, and the respondent applied in 1999, and I understand that there were factors as to what he was told about asylum when he first arrived, but he did apply after the May 1998 riots, and I would argue that changed circumstances were the riots itself, and then he applied in 1999, which is about a year or more after the riots occurred. Thank you, Counsel. But doesn't the Hakim case, I mean, isn't it indistinguishable from this case in terms of jurisdiction over the asylum claim in the time in this issue? Your Honor, I would argue that there is not a jurisdictional problem, but I know the government argues otherwise based on statute. All right. Thank you. Thank you. Yes, please. Counsel, how do you meet the argument of the appellant that there really should be no requirement of reporting to the police in view of the evidence that the younger brother was killed at age 11, and they went to the police, and the police told them that's the fate of Chinese? Well, Your Honor, I would respond that that happened in 1972, and that the events that we're talking about now occurred in the 90s. In 96 is when they left. So, you know, over a 20-year span has occurred that, you know, the country condition reports, you know, they show that, yes, violence waxes and wanes, but the government does at least express the position that they're trying to improve the China-Indonesian relations in that country. So, you know, for them to just abstain from going to the police after every incident, just on what happened over 20 years ago, I would say is not a reasonable position. With regard to asylum, I would just say that that is a position that we've explained in our brief, and that it's a time-barred claim. So moving on with the court's motion to the withholding claim. Let me just ask you, how does this disfavored group analysis change when you're dealing with a withholding case as opposed to an asylum case? Does it change? Well, I think it does change because we're talking about now a more stringent burden of proof as to the actual persecution and their fear of that persecution. That is, for asylum, all they have to show is a well-founded fear of future persecution, or that they experienced past persecution, which then a presumption arises that they would have a well-founded fear. Withholding in trial, we did not. Yes, Your Honor. Whereas withholding, typically with courts, they say if you can't meet the burden for asylum, obviously you can't meet the more stringent for withholding because it's a clear probability of persecution, not just having a well-founded fear. So, you know, when we're talking about the disfavored group analysis that was first explained in Sayle, that case, I would say that not only do they have to show that they're part of the disfavored group by a heightened standard of proof, but they would also show that their individualized risk, the evidence that goes into that has to be shown by a more stringent burden of proof. Wait a minute. Doesn't the membership in the disfavored group lowers the amount of proof that the individual petitioner must prove to show that there has been persecution and the likelihood of persecution in the future? Don't you agree? In asylum cases, yes, Your Honor. Does that apply to withholding cases also? I would say no, because it is a higher burden of proof. Otherwise, the distinction would be irrelevant. The higher burden of proof has to do with whether it's more likely than not that they will be persecuted. But doesn't membership in the disfavored group on that sliding scale as discussed make it more likely that they will be persecuted? If you're putting it in those terms, yes, Your Honor. Yeah. I mean, under that analysis, I'm talking about their burden of proof, not the analysis for. I'm talking about in the abstract. In the abstract, there's a higher burden for withholding than for asylum. So if you go to the disfavored group, there still would be a higher burden for withholding than for asylum, even with the disfavored group analysis. Is that your argument? Yes, Your Honor, because they still have to show that their individualized risk that they face under the SAIL, just because you're part of a disfavored group, SAIL has a part two. And it says that not only do you have to be part of a disfavored group, you also have to show that there's an individualized risk. Now, the more harm that comes to the disfavored group, the less you have to show for individualized risk. However, you still have to you have that burden. What we're arguing is that because this is a withholding case, that burden is has to be proven by a different standard of proof, a clear probability that this is going to happen, that this individualized risk will occur in the future and not merely that they have a well-founded fear that this individualized risk. If it's more likely than not that the disfavored group will face persecution, does not membership in the disfavored group give the individual the right to claim withholding? Yes, Your Honor. Under that slight scale. Yes, Your Honor. After the 1998 anti-Christian riots in Indonesia, it's pretty clear that Christians are a disfavored group there. Yes, Your Honor. And so why is membership in the disfavored group sufficient? Well, because then we look at the individual facts here. If you look at Sayle, one of the things that happened in Sayle was that she expressed a fear of being raped because she expressed that there was evidence of these riots and women being pulled out of cars and assaulted. And, you know, she was almost pulled out of a car. I mean, there was a severe personal risk there that she faced that never occurred here, that never occurred in this case. And that the fact that we have family members, female family members of both the husband, the petitioner in this case, and the wife, she has two sisters, apparently one of them is now in the United States, but one of them still remains in Indonesia that have faced no harm whatsoever. And they are positioned similarly, I would say, to how petitioner's wife would have been. So I say Sayle on that ground alone is distinguishable, readily distinguishable in my opinion. Was Sayle an asylum case or a withholding case? It was an asylum case, Your Honor, and thus there was a lower burden of proof. And so I think that Sayle is distinguishable on those two grounds, is that Sayle was an asylum case, not a withholding, thus there was a lower burden. And that in Sayle, there was no evidence that family members who were similarly situated faced that kind of risk. Whereas in our case, family members remain in Indonesia, similarly situated, nothing has happened to them. Or at least no information has come forward since then that anything has happened to them. So on that ground, we would say that that case is distinguishable. Now, recognizing that there's another case out there that was recently submitted to the court under the 28-J rule, and that is the Lelong case. In the Lelong case, the court held that there's also a special subgroup of Indonesians that face a greater risk than the average disfavored group. That is, if that person is a woman and a Christian, that subgroup faces a greater risk. And in that case, in the Lelong case, they found that that was sufficient to grant asylum in that case. And that was not a withholding case. No, Your Honor. No, it wasn't. So, again, that's distinguishable on that ground because of the lower burden of proof. However, the government submits that and moves, actually, the court, that if the court does decide that the Lelong case is precedent in this case and controlling precedent, we would, because Lelong is now facing a petition for rehearing en banc, we would hold that or move that you hold the mandate in abeyance in the present case, pending the en banc decision in Lelong. All right. Thank you, counsel. Thank you, Your Honor. We'll give you one minute for rebuttal, counsel. Your Honor, we, the petitioner would argue that the disfavored group analysis is equally applicable to a withholding case. And also, the petitioner's wife did suffer a lot of individualized risk when she was on public transportation. She was sexually harassed on many occasions. And I don't see it being any different from Sahel being targeted as a Chinese female. The government argues that there was no evidence about family members in Indonesia being harmed, but the record was preserved at the time the case was heard in 1999. And if I understand, we're not supposed to add on to the record. So I had already mentioned just now that they have. Is it your submission that the inappropriate touching of the wife as she rode the bus rose to the same level of persecution as a threatened rape in Sahel? Your Honor, she was also hit on her face and her eye. She was bruised, too. She was physically injured. There was facts relating to that also. Is there a citation to the record as to the physical injury on the bus? Let me get it, Your Honor. Your Honor, the certified administrative record 127. She was struck in her eye and also punched in her face. Punched in her face. All right. Thank you, counsel. Thank you to both counsel for your argument in this case. The case just argued is submitted for decision by the court. The next case, United States v. Barnum, has been removed from the calendar. The next two cases, United States v. Flores-Pimienta and Rangel v. United States, have been submitted on the brief. The next case on calendar for argument is Primiani v. National Union Fire Insurance. Counsel, please approach and proceed.
judges: D.W. Nelson, Rawlinson, Bea